# Exhibit A

# IN THE CIRCUIT COURT
## FOR THE 14TH JUDICIAL DISTRICT
## COFFEE COUNTY, TENNESSEE

| | |
|---|---|
| JENNIFER LYNN BEAN, ALLEN BEAN, GREGORY MOORE, and MICHELLE MOORE, on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )   Case no. 23-cv-49184 |
| ARISTOCRAT LEISURE, LLC, ARISTOCRAT TECHS., INC., and PRODUCT MADNESS, INC., | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jennifer Lynn Bean, Allen Bean, Gregory Moore, and Michelle Moore, each an adult resident citizen of Coffee County, Tennessee, on behalf of themselves and all others similarly situated in the state of Tennessee, files this amended state-wide class action complaint against Aristocrat Leisure, LLC; Aristocrat Technologies, Inc., and Product Madness, Inc. (collectively "Aristocrat").

## INTRODUCTION

1.      This state-wide class action seeks recovery of illegal gambling losses by Tennessee residents who played Aristocrat's illegal online gambling games.

1

Plaintiffs seek, on their own behalf and on behalf of all similarly situated Tennessee residents:

(1) a declaratory judgment that Aristocrat's games violate federal law, and that Aristocrat's online terms of service set out the terms and conditions under which the illegal gambling is conducted;

(2) a declaratory judgment that the online terms of service and the arbitration provision contained in the terms of service are each void as violative of Tennessee law;

(3) recovery under Tennessee's gambling loss recovery statutes, for a class of players of the games under Section 29-19-104 of the Tennessee Code, and for a class of family members of such players, under Section 29-19-105.

## PARTIES, VENUE, AND JURISDICTION

2.      Plaintiffs Jennifer Lynn Bean and Allen Bean are adult resident citizens of Coffee County, Tennessee. These plaintiffs are married to one another.

3.      Plaintiffs Gregory Moore and Michelle Moore are adult resident citizens of Coffee County, Tennessee. These plaintiffs are married to each other.

4.      Defendant Aristocrat Leisure, Ltd., is a foreign corporation organized and existing under the laws of Australia, headquartered in North Ryde, New South Wales, Australia. It does business through its online gambling games throughout the

2

United States, including throughout the state of Tennessee and in Plaintiffs' home county. It does not have a physical location in the state of Tennessee.

5. Defendant Aristocrat Technologies, Inc. is a corporation organized under the laws of Nevada with its principal place of business in Las Vegas, Nevada. It does business through its online gambling games throughout the United States, including throughout the state of Tennessee and in Plaintiffs' home county. It does not have a physical location in the state of Tennessee.

6. Defendant Product Madness, Inc., is a corporation organized under the laws of Delaware with its principal place of business in Fife, Washington. It does business through its online gambling games throughout the United States, including throughout the state of Tennessee and in Plaintiffs' home county. It does not have a physical location in the state of Tennessee.

7. Because Aristocrat does not have a physical location in Tennessee and all plaintiffs are from Coffee County, venue is proper in this court.

8. This Court has personal jurisdiction over Aristocrat because the company has sufficient minimum contacts to support specific personal jurisdiction in the state, and those contacts are directly related to Plaintiffs' claims. See International Shoe Co. v. Washington, 326 U.S. 310 (1945).

9. Aristocrat's minimum contacts with the state of Tennessee including ongoing contractual relationships created by the terms and conditions on the

Defendants' apps. Aristocrat required Plaintiffs Allen Bean and Gregory Moore, along with all other Tennessee customers who played the games, to agree to these terms. Both the Sixth Circuit and the United States Supreme Court, among many others, have found that personal jurisdiction is proper "where a defendant 'has created continuing obligations between himself and the residents of the forum." <u>Air Products and Controls, Inc. v. Safetech Intern., Inc.</u>, 503 F.3d 544, 551 (6th Cir. 2007) (quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472 (1985)).

10.    Aristocrat's contacts with Tennessee also include direct solicitations and other communications, initiated by the company, with customers in Tennessee. These include in-game messages and advertisements sent to players. Further, social and sweeps casino companies specifically target individuals who spend money on the apps, including by sending them direct, targeted advertisements to play the game, purchase coins, or participate in particular features of the games. <u>See</u> "How social casinos leverage Facebook user data to target vulnerable gamblers," PBS News Hour, available at https://www.pbs.org/newshour/show/how-social-casinos-leverage-facebook-user-data-to-target-vulnerable-gamblers (last accessed July 11, 2025). These communications and advertisements specifically directed by Aristocrat to particular current and prospective players in Tennessee constitute purposeful contacts with the state.

**RELEVANT FACTS**

4

**A.**    **Defendants' Gambling Games**

11.    Aristocrat is a game developer that has created games that simulate slot machines and other gambling games, and made them available to the Tennessee public through its smartphone applications, including, but not limited to Heart of Vegas, Cashman Casino, Lightning Link Casino Slots, Big Fish Casino, Mighty Fu Casino and NFL Super Bowl Slots.

12.    The games in Aristocrat's apps are games of chance that slot machines, other casino-style games, card games and other games of chance. Below is a typical example of such games:



13.    Aristocrat's games operate with virtual coins that can only be used to play the games. Customers initially receive some coins for free. They risk those coins on the games of chance in an attempt to win more coins. If they lose, the lose the

coins wagered. If they win, they win additional coins allowing them to play longer. When a consumer runs out of coins entirely, the apps have coins available for purchase, which allow the player to continue playing the game with full functionality. Customers who purchase these coins do so to risk them on further games of chance.

14.    Plaintiffs Allen Bean and Gregory Moore have spent money to purchase virtual coins from Aristocrat, and used those coins to play Aristocrat's gambling games. These purchases were made within the ninety days preceding the filing of the complaint.

15.    Plaintiffs Jennifer Lynn Bean and Michelle Moore have not played Defendants' gambling games, but are married to Allen Bean and Gregory Moore respectively.

**B.    Defendants' Games Have Gravely Harmed the Classes and the State of Tennessee.**

16.    The social ills caused by "social casino" and "sweeps casino" games are well-documented. Media reports how gambling addicts spend enormous, and completely unaffordable, amounts of money on these casino games. One nurse in Houston is reported to play a slot machine game similar to defendants' here for a minimum of two hours a day. (Ex. 1, https://www.nbcnews.com/tech/technews/addicted-losing-how-casino-apps-have-drained-people-millions-n1239604 (last accessed on Aug. 19, 2024)).  Between her

6

and her husband, who plays the game with her, she estimates they have lost $150,000. She asked NBC News to withhold her name "so her family does not find out how much money they have spent on the game." (Id.). She said her and her husband "lie in bed next to each other, we have two tablets, two phones and a computer and all these apps spinning Reel Rivals at the same time. We normalize it with each other." (Id.). This is not an isolated instance.

17.     NBC News spoke to 21 people, including Shellz [the Houston nurse] and her husband, who said they were hooked on the casino-style games and spent significant sums of money. They described feelings of helplessness and wanting to quit but found themselves addicted to the games and tempted by the company's aggressive marketing tactics. "Most of the 21 players wished to remain anonymous, as they were ashamed of their addictions and did not want their loved ones to find out about their behavior." (Id.). For example, a "42-year-old Pennsylvania woman said she felt saddened that she spent $40,000 [on a social casino app that competes with defendants'] while working as an addiction counselor. 'The whole time I was working as an addiction counselor, I was addicted to gambling and with no hope of winning any money back,' she said."

18.     It is scarcely a defense that "social casino" slot machines do not afford gamblers the opportunity to win real money because the currency in such games consists of "virtual coins" that are only redeemable as additional opportunities to

play the games. This is so for at least two reasons. First, those with gambling addictions have been documented to lose thousands of dollars playing these slot machines, to the point of financial ruin and marital strife, even though these gamblers could never win their money back – only the opportunity for additional spins at the slot machine. Second, the law in many states, including Tennessee, states that the opportunity to win additional playing time is a "thing of value" such that gambling for more playing time is illegal gambling even though the gambler never has the opportunity to win her money back. See State v. Vance, 2004 WL 746296 (Tenn. Ct. App., Knox 2004) (holding that additional amusement is a thing of value under Tennessee's gambling statutes); Tenn. Code § 39-17-501(2).

19.     Anecdotal reports of gambling addictions in connection with social casino games like defendants' are buttressed by recent scientific studies that confirm that social casino apps appeal to gambling addicts in much the same way as real Las Vegas-style casinos, and have a particular appeal to teenagers. One of the more troubling statistics comes from studies that show that 30% of social casino gamers between the ages of 12 and 18 later become regular gamblers. Hollingshead, et al., "Motives for playing social casino games and the transition from gaming to gambling (or vice versa): social casino game play as harm reduction?" 46 Journal of Gambling Issues 43 (2021). More broadly, over half of social casino players reported gambling on a regular basis. (Id.). Because of this overlap, traditional gambling

operators are now heavily invested in defendants' industry as a way to port players from social casino games to real casinos. (Id.). One study showed that an astonishing 58.3 percent of gamblers seeking treatment for gambling addiction "reported social casino games as being their first introduction to gambling activities." Kim, "Social Casino Games: Current Evidence and Future Directions," Gambling Research Exchange Ontario.

20.     Companies in the social casino industry, including Defendants, have extracted tens of millions of dollars from Tennessee's economy in the last five years, all without adding anything to the economy of the state or paying a dime in taxes to the Tennessee treasury. Instead, the money extracted from Tennessee's economy ends up in places like Aristocrat's home country of Australia, as well as Canada, Hong Kong, Cyprus, and Israel, where other major companies in the industry are headquartered. According to research on the industry as a whole, social casinos and sweeps casinos had estimated 2024 revenues of 7.1 billion and 10.6 billion, respectively. https://kpmg.com/kpmg-us/content/dam/kpmg/pdf/2025/sweepstakes-gaming-emerging-industry-primer.pdf. Even if Tennessee consumers represent but a small percentage of that total, the reality is that a great deal of money is being siphoned from the state's economy each year.

## CLASS ALLEGATIONS

21.    Plaintiffs Allen Bean and Gregory Moore seek to certify a class for which they will pursue claims in counts 1, 2, and 3 below, pursuant to Rule 23 of the Tennessee Rules of Civil Procedure. This class, the "players class" is defined as follows:

> All Tennessee residents who have spent money to purchase virtual coins through Aristocrat's smartphone applications, including but not limited to Heart of Vegas, Cashman Casino, Lightning Link Casino Slots, Big Fish Casino, Mighty Fu Casino and NFL Super Bowl Slots., within the 90 days preceding the filing of the complaint and continuing to a date to be set by the Court following certification. All employees of the Court and plaintiff's counsel, and their families, are excluded.

22.    Plaintiffs Jennifer Lynn Bean and Michelle Moore seek to certify a class for which they will pursue the claim in counts 1, 2, and 4 below, pursuant to Rule 23 of the Tennessee Rules of Civil Procedure. This class, the "family members class" is defined as follows:

> All people who are the spouse, child, or next of kin of any Tennessee resident who spent money to purchase virtual coins through Aristocrat's smartphone applications, including but not limited to Heart of Vegas, Cashman Casino, Lightning Link Casino Slots, Big Fish Casino, Mighty Fu Casino and NFL Super Bowl Slots., during a period between 90 days and one year prior to the filing of the complaint. All employees of the Court and plaintiff's counsel, and their families, are excluded.

23.    Each of the proposed classes meets the numerosity requirement in Rule 23.01(1), because there are so many class members that joinder of all of them in this case is impracticable. There are thousands of Tennessee residents who have spent

money to play the game and are thus members of the players class. There are obviously more individuals who are members of the family members class.

24.     The classes also satisfy the commonality requirement of Rule 23.01(2) because there are central questions of fact and law that are common to the class. Such common question include, at a minimum, (a) whether Aristocrat's games are games of chance; (b) whether free play is a thing of value under Tennessee law; (c) whether Aristocrat's games constitute illegal gambling under Tennessee law; (d) whether members of the players class are entitled to recover their losses pursuant to Section 29-19-104 of the Tennessee Code; (e) whether members of the family members class are entitled to recover the losses of players between three months and a year ago pursuant to Section 29-19-105 of the Tennessee Code; and (f) whether Aristocrat's terms of service and the arbitration agreement contained therein are each void under Tennessee law.

25.     Each of the proposed classes satisfies the typicality requirement of Rule 23.01(3) because, for each class, the claims of the plaintiffs proposed as class representative are typical of the claims of the class members. In the players class, both plaintiffs and the class members lost money in an effort to win additional playing time and amusement on Aristocrat's illegal gambling games. For the family members class, the named plaintiffs are spouses of people who played the game, and

their claims are typical of all members of the class who can recover as family members pursuant to Section 29-19-105 of the Tennessee code.

26.    The named plaintiffs will fairly and adequately represent the interests of the classes pursuant to Rule 23.01(4). Plaintiffs have no interests that conflict with the interests of the class. Furthermore, plaintiffs have retained competent and experienced trial counsel with decades of experience litigating class cases.

27.    Plaintiffs seek to maintain these classes pursuant to Rule 23.02(3), which allows for class actions where:

> The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include
>
> (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions
>
> (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
>
> (d) the difficulties likely to be encountered in the management of a class action.

28.    The common questions of law and fact in this case vastly predominate over any individual issues affecting only individual class members. The *only* individual issue presented by these class members is the exact amount of money

damages to which each class member is entitled. Such damages issues are routinely held not to predominate over common questions in cases like this. Indeed, the individual damages issues can be quickly and accurately resolved by examining Aristocrat's own records.

29.     Class treatment is by far superior to individual litigation as a fair and efficient way to adjudicate this controversy. Given the relatively small individual amounts at issue, it is unlikely that there would be any adjudication of the class claims in this case at all.

30.     For this reason, none of the class members have any interest in controlling the prosecution of separate actions. Likewise, to our knowledge, no class member has commenced a pending action concerning this controversy.

31.     It would be much more desirable to concentrate this case in one action rather than allow the prosecution of individual actions because, as noted, such individual actions would likely never be filed because class members would be unlikely to have any motivation to file an individual suit.

32.     Plaintiff's counsel foresee no particular difficulties in managing this case as a class action because all of the necessary information to compensate the individual class members is contained in Aristocrat's own records concerning users' purchases and in the records of the platforms that facilitate the service. Defendants and the platforms they use to provide the games keep extensive records which will

demonstrate not only the aggregate amounts lost by players in Tennessee, but the identities of the individual players and the amounts of their individual losses. This information is easily ascertainable in discovery.

## ARISTOCRAT'S GAMES VIOLATE TENNESSEE AND FEDERAL LAW

33.     Other than the state-run lottery, all forms of gambling are illegal in Tennessee.

34.     "Gambling is contrary to the public policy of this state and means risking anything of value for a profit whose return is to any degree contingent on chance, or any games of chance associated with casinos, including but not limited to, slot machines, roulette wheels and the like." Tenn. Code Ann. § 39-17-501(2).

35.     The Tennessee code further defines "profit" in the definition quoted in paragraph 33 as "anything of value in addition to the gambling bet." Tenn. Code Ann. § 39-17-501(8). Under Tennessee law, games of chance are thus illegal if a patron pays money for the chance to win anything of value.

36.     Case law has defined a thing of value to include free or extended playing time. See State v. Vance, 2004 WL 746296 (Tenn Ct. App., Knox. 2004) ("The Court explained that the chips that were randomly awarded by the vending machine were 'things of value' under the gambling statutes because the chips allowed the customer to continue the operation of the machine for amusement.") (citing Painter v. State, 45 S.W. 2d 46 (Tenn. 1932). Likewise, the virtual coins in

14

Aristocrat's apps allow the customer to continue the operation of the game for amusement.

37.    Because the gambling games are illegal in Tennessee, when such games are played in Tennessee, they are also illegal under federal law pursuant to 18 U.S.C. § 1955, as more fully set forth in Count One below.

## CLAIMS FOR RELIEF

## COUNT ONE: DECLARATORY ACTION THAT THE GAMBLING IS ILLEGAL UNDER FEDERAL LAW, MAKING DEFENDANTS' TERMS OF SERVICE UNENFORCEABLE IN FEDERAL COURT

38.    Plaintiff incorporates the factual and legal averments of Paragraphs 2-37 by reference as if fully set forth in this count.

39.    Plaintiff seeks, on behalf of herself and the class, a declaratory judgment that:

a. Aristocrat's conduct in Tennessee is an "illegal gambling business" under 18 U.S.C. § 1955;

b. The "Terms of Service" found in Aristocrat's apps, which are available at the website https://www.productmadness.com/terms-of-service/, set out the terms and conditions under which Aristocrat's illegal gambling is conducted.

c. The Terms of Service are unenforceable in federal court.

40.    The relevant language of 18 U.S.C. Section 1955 states:

**(1)** "illegal gambling business" means a gambling business which—

**(i)** is a violation of the law of a State or political subdivision in which it is conducted;

15

**(ii)** involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

**(iii)** has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

28 U.S.C. § 1955(b)(1).

41.    As to the first element required to find an illegal gambling business under Section 1955 Aristocrat's games are in fact illegal gambling under Tennessee law, which bars spending money for the opportunity to receive anything of value, contingent upon chance.

42.    As to the second element under Section 1955, Aristocrat certainly employs more than 5 persons who conduct, finance, manage, supervise, direct or own all or part of its business.

43.    The third element of Section 1955 is also met. Aristocrat has both been in business for more than 30 days in Tennessee, and has had gross revenue of more than $2000 in a single day. Aristocrat has conducted business in Tennessee for multiple years, and, upon information and belief, has collected gross revenue of more than $2000 in a single day on multiple occasions.

44.    Because all three elements of Section 1955 are met, Aristocrat's conduct in Tennessee constitutes an illegal gambling business, and Claimant's first request for declaratory judgment is due to be granted.

45.     The second request for declaratory judgment should also be granted. The "Terms of Service" found on Aristocrat's websites, do in fact set out the terms and conditions under which the illegal gambling thereon is conducted. Plaintiff expects Aristocrat will challenge the words "illegal" and "gambling" in this request, but will likely not dispute the fact that its terms and conditions govern the operation of the games and all of the activity it conducts in Tennessee.

46.     Because the contract, as described above, is illegal pursuant to federal law, namely 18 U.S.C. § 1955, federal courts, pursuant to United States Supreme Court precedent, are not permitted to enforce the contract in aid of such illegal activity. See Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 84 (1982), which held:

> It is . . . well established . . . that a federal court has a duty to determine whether a contract violates federal law before enforcing it. "The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in . . . federal statutes. . . . Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power."

(quoting Hurd v. Hodge, 334 U.S. 24, 34-35 (1948)).

## COUNT TWO: DECLARATORY JUDGMENT THAT DEFENDANTS' TERMS OF SERVICE AS A WHOLE AND THE ARBITRATION PROVISION ITSELF ARE EACH VOID UNDER TENNESSEE LAW

47.     Plaintiff incorporates the factual and legal averments of Paragraphs 2-46 by reference as if fully set forth in this count.

48.     As set forth above, Defendants' games are governed by terms of service that facilitate the illegal gambling, namely Defendants' Terms of Service. The Terms of Service are therefore void pursuant to Section 29-19-101, which states: "All contracts founded, in whole or in part, on a gambling or wagering consideration, shall be void to the extent of such consideration."

49.     Aristocrat's terms and conditions also contain provisions within the arbitration agreement that exist in aid of the illegal gambling conduct, and are thus void and unenforceable. For example, Aristocrat's terms of service purportedly bar customers from pursuing claims "pursuant to any statute that allows recovery on behalf of, for the benefit of, or of amounts lost or spent by other individuals." https://www.productmadness.com/terms-of-service/ at § 27. As explained below, Tennessee's statutory scheme allows family members to recover amounts lost by other individuals Tenn. Code Ann. § 29-19-105. Thus, this provision attempts to exculpate Aristocrat from the clear consequences of its intentional illegal activity in Tennessee.

50.     Plaintiffs seek, on their own behalf and on behalf of the class, a declaration that Aristocrat's terms of service, and, separately, the arbitration agreement contained therein, are each void under Tennessee law.

**COUNT THREE: CLASS CLAIMS FOR INDIVIDUAL LOSSES**

51.     Plaintiff incorporates the factual and legal averments of Paragraphs 2-50 by reference as if fully set forth in this count.

52.     The Tennessee Code provides a statutory civil cause of action to recover money paid and lost due to gambling. Section 29-19-104 provides:

> Any person who has paid any money, or delivered anything of value, lost upon any game or wager, may recover such money, thing, or its value, by action commenced within ninety (90) days from the time of such payment or delivery.

Tenn. Code Ann. § 29-19-104.

53.     On behalf of themselves and the class described in Paragraph 21, above, Plaintiffs Allen Bean and Gregory Moore seek for each class member recovery of the amount paid for purchases through Aristocrat's apps during the ninety days preceding the filing of this complaint.

### COUNT FOUR: CLASS CLAIM FOR THIRD PARTY LOSSES

54.     Plaintiff incorporates the factual and legal averments of Paragraphs 2-52 by reference as if fully set forth in this count.

55.     After the 90-day period during which the losing gambler may recover his or her money, the Tennessee Code provides that any person may then sue and recover on behalf of the gamblers' family members:

> Any other person may, after the expiration of the ninety (90) days, and within twelve (12) months thereafter, recover the amount of such money, thing, or its value, by action for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser.

19

Tenn. Code Ann. § 29-19-105.

56.     Pursuant to Section 29-19-105 of the Tennessee Code, Plaintiffs Jennifer Lynn Bean and Michelle Moore bring claims on behalf of themselves and the class described in paragraph 22 above.

## NOTE ON ARBITRATION

57.     Plaintiffs Allen Bean and Gregory Moore, along with the class described in Paragraph 20, who actually played Aristocrat's illegal gambling games, are subject to arbitration agreements which Aristocrat requires all of its users to agree to.

58.     The arbitration agreements are found in the Terms of Service of Aristocrat's smartphone applications, including Heart of Vegas, Cashman Casino, Lightning Link Casino Slots, Big Fish Casino, Mighty Fu Casino and NFL Super Bowl Slots. These terms can be found online at https://www.productmadness.com/terms-of-service/. (last accessed August 25, 2025.)

59.     It is for an arbitrator to determine whether these terms constitute an illegal contract that is void and unenforceable under Tennessee and federal law. See Tenn. Code Ann. § 29-1-101 ("All contracts founded, in whole or in part, on a gambling or wagering consideration, shall be void to the extent of such consideration."); see also Count One ¶¶ 38-46.

20

60.     The United States Supreme Court has made it clear that the determination of illegality of a contract containing an arbitration clause is for the arbitrator in the first instance. See, e.g., Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 446 (2006).

61.     The Supreme Court has also held that federal courts must stay, rather than dismiss, when a party requests a stay pending arbitration. Smith v. Spizzirri, 601 U.S. 472, 474 (2024) (noting that Section 3 of the Federal Arbitration Act does not "permit[] a court to dismiss the case instead of issuing a stay when the dispute is subject to arbitration and a party requests a stay pending arbitration.")

62.     Plaintiff intends to file a motion to stay pending the outcome of arbitration. Under Smith v. Spizzirri, this motion is due to be granted.

## PRAYER FOR RELIEF

Pursuant to the legal and factual averments above, Plaintiff respectfully asks this court to:

1. Take jurisdiction of this cause;

2. Grant plaintiff's motion to stay the case pending the outcome of arbitration;

3. Following arbitration and discovery, certify a class of players of the game to pursue the claims in counts 1, 2, and 3 herein as a class action;

4. Following arbitration and discovery, certify a class of family members of game players to pursue the claims in counts 1, 2, and 4 herein as a class action;

5. Appoint the undersigned as Class Counsel and named plaintiffs Allen Bean and Gregory Moore as class representatives of the players class;

6. Appoint the undersigned as Class Counsel and named plaintiffs Jennifer Lynn Bean and Michelle Moore as class representatives of the family members class;

7. Enter a final judgment against Aristocrat awarding plaintiffs Allen Bean and Gregory Moore, and the members of the players class, a refund of the money they spent purchasing virtual coins to play Defendants' illegal gambling games in the period between 90 days prior to the filing of the complaint and the entry of judgment under Section 29-19-104 of the Tennessee code;

8. Enter a final judgment against Aristocrat awarding plaintiffs Jennifer Lynn Bean and Michelle Moore, and the members of the family members class, a refund of the money spent by their family members to purchase coins to play Defendants' illegal gambling games in the period between one year prior to the filing of the complaint and 90 days prior to the filing of the complaint;

9.  Award Class Counsel reasonable attorneys' fees and expenses to be paid from the common fund judgement in favor of the class;

10. Award the named plaintiffs a reasonable sum of money for services in this case on behalf of the class, also to be paid out of the judgment in favor of the class;

11. Award interest and costs; and

12. Award any other relief to which the Court finds plaintiff and the classes are entitled.

Respectfully submitted this 29th day of August 2025,


/s/      Garth R. Segroves
One of the attorneys for Plaintiff

**COUNSEL:**

Garth R. Segroves
113 West Moore Street
Tullahoma, Tennessee 37388
Telephone: 931.393.4366
Facsimile: 931.259.4466
garth_segroves@att.net

Jeffrey L. Bowling
BEDFORD, ROGERS & BOWLING, P.C.
303 North Jackson Street
P.O. Box 669
Russellville, Alabama 35653-0669
Telephone: 256.332.2880
jeffbrbpc@bellsouth.net

Dargan M. Ware
DAVIS & NORRIS, LLP
2154 Highland Ave. South
Birmingham, Alabama 35205
Telephone: 205.930.9900
Facsimile: 205.930.9989
dware@davisnorris.com